**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**UNITED STATES OF AMERICA,**

Plaintiff**,**

**v.**

**DARRELL ERNEST REESE,**

Defendant.

**Criminal Action No.:   1:19-CR-54-2
(JUDGE KLEEH)**

## REPORT AND RECOMMENDATION RECOMMENDING DEFENDANT'S MOTION TO SUPPRESS BE DENIED

This matter comes before the undersigned pursuant to a referral order (ECF No. 52) entered by Honorable United States District Judge Thomas S. Kleeh on December 4, 2019, referring Defendant's Motion to Suppress Physical Evidence (ECF No. 51) to the undersigned for a hearing and Report and Recommendation. The Government filed a Response (ECF No. 53) to Defendant's Motion to Suppress on December 19, 2019. The undersigned held a Motion Hearing on January 15, 2020, at which the Defendant, Darrell Ernest Reese, appeared in person and by Counsel, Hilary Godwin, Assistant Federal Public Defender and the Government by Counsel, Zelda Wesley, Assistant United States Attorney. This matter is now ripe for a Report and Recommendation to the Honorable United States District Judge Thomas S. Kleeh.

This Report and Recommendation examines the following issues: (1) Whether Lieutenant Kennedy had reasonable, articulable suspicion of unlawful conduct to initiate a traffic stop of Defendant's vehicle; and (2) whether Lieutenant Kennedy had probable cause to conduct a warrantless search of Defendant's vehicle. Answering both issues in the affirmative for the reasons

1

stated herein, the undersigned **RECOMMENDS** the Defendant's Motion to Suppress Physical Evidence (ECF No. 51) be **DENIED**.

## I.     BACKGROUND AND PROCEDURAL HISTORY

On March 21, 2019, Lieutenant Shawn Kennedy of the West Virginia State Police was traveling "south on Interstate 79 near the 128 mile marker in the passing lane." (ECF No. 64-1 at 1)[1]. Lt. Kennedy "approached a Kia Sorento, silver in color, that was traveling in the slow lane." Id. The vehicle "swerved over in front of" Lt. Kennedy and "slowed to a speed of 58 miles per hour." Id. Lt. Kennedy initiated a "traffic stop on said vehicle at the 128.5 mile marker in Harrison County." Id. at 1-2. Lt. Kennedy approached the vehicle and spoke with the driver who was identified as the Defendant Darrell Ernest Reese. Id. at 2. Lt. Kennedy requested Mr. Reese's driver's license, registration and proof of insurance. Id. "Mr. Reese advised he did not have a license" because it was "suspended and he was driving because the male passenger owned the vehicle and was sick." Id.

Lt. Kennedy observed that "Mr. Reese was sweating profusely." Id. Upon running a license check, Lt. Kennedy discovered that Mr. Reese's license was revoked "for DUI with an effective date of 12-22-17." Id. Lt. Kennedy placed Mr. Reese "under arrest and placed him" in his cruiser. Id. Lt. Kennedy then approached the passenger side of the vehicle to speak with the male passenger who was identified as Keith Edward Ross. Id. Mr. Ross opened the passenger door and Lt. Kennedy "observed a plastic baggie on the floorboard containing a white powdery substance and several capsules consistent with heroin packaging." Id. Lt. Kennedy asked Mr. Ross to exit the vehicle. Id. Lt. Kennedy placed Mr. Ross in handcuffs "and inquired about the capsules on the

---

[1] The factual recitation contained in this section is taken directly from Lieutenant Kennedy's Criminal Complaint filed in the Magistrate Court of Harrison County, West Virginia, submitted as the parties' Joint Exhibit No. 1 (ECF No. 64-1) at the motion hearing held on January 15, 2020.

floorboard." Id. Mr. Ross denied any knowledge of the capsules. Id. Lt. Kennedy "retrieved said baggie from the floorboard and found it to be consistent with heroin." Id. Mr. Ross then advised that he and Mr. Reese "were returning from Baltimore and the substance in said baggie was heroin which he was transporting to Raleigh County to sell." Id. Mr. Ross further advised "he paid $4,400 for the substance." Id. Lt. Kennedy reported that the substance "had an approximate weight of 69 grams." Id. Mr. Ross and Mr. Reese were placed under arrest and taken in for processing. Lt. Kennedy applied and received a search warrant for the vehicle.

On September 4, 2019, Defendant Darrell Ernest Reese was indicted on Two Counts of a Two Count Indictment (ECF No. 1) charging him with Aiding and Abetting Possession with Intent to Distribute Heroin and Aiding and Abetting Possession with Intent to Distribute Fentanyl in violation of Title 21, United States Code, Section 841(a)(1), 841(b)(1)(C), and Title 18, United States Code, Section 2. Defendant appeared before the undersigned for an Initial Appearance, Arraignment, and Detention Hearing on October 28, 2019 (ECF No. 17).

Defendant, by Counsel Hilary Godwin, Assistant Federal Public Defender, filed a Motion to Suppress Physical Evidence (ECF No. 51) on December 4, 2019. The Government filed a Response (ECF No. 53) in Opposition to Defendant's Motion on December 19, 2019. A Motion Hearing was held before the undersigned on January 15, 2020, at which Lieutenant Shawn Kennedy testified and evidence was taken. A summary of the motion hearing is included below.

## II.     SUMMARY OF TESTIMONY

### A.  Lieutenant Shawn Kennedy

The first and only witness called to testify during the Motion Hearing held on January 15, 2020, was Lieutenant Shawn Kennedy. Lt. Kennedy works for the West Virginia State Police as a Logistic Officer in Marion County, West Virginia. Lt. Kennedy has worked as a police officer for

twenty-two years. As a Logistic Officer, Lt. Kennedy schedules maintenance for vehicles, assigns new vehicles, schedules maintenance for buildings, and orders all supplies for eleven counties in the northern part of West Virginia. (Audio Recording of Motion hearing held on January 15, 2020, in Clarksburg Magistrate Judge Courtroom, FTR Gold, at 10:00:56 – 10:01:26).[2] Previously, from 1998-2010, Lt. Kennedy worked as a road trooper. (10:01:30 – 44).

On March 21, 2019, Lt. Kennedy was driving at approximately 6:30 A.M. on I-79 in his "unmarked, blue Ford Explorer cruiser." (10:02:24 – 52). Despite being unmarked, Lt. Kennedy's cruiser is equipped with emergency lights for initiating traffic stops. Lt. Kennedy was driving southbound on this morning and had just entered Harrison County, West Virginia. (10:03:08 – 14). Upon entering Harrison County, Lt. Kennedy noticed a vehicle in front him that he was approaching and Lt. Kennedy "moved over into the fast lane to pass that vehicle." (10:03:22 – 36). The vehicle was a silver Kia "utility vehicle." Lt. Kennedy testified there were no other vehicles around him or the other vehicle at that time. Lt. Kennedy testified he was driving in the "slow lane" as he approached the Kia which was also traveling in the "slow lane." (10:03:40 – 10:04:01).

Lt. Kennedy testified he "noticed the vehicle a good way up in front" of him and Lt. Kennedy noticed that he was quickly "gaining on the vehicle." Lt. Kennedy testified the vehicle was obviously traveling slower than him so he decided to move into the "fast lane" in order to pass the vehicle. (10:04:09 – 20). Lt. Kennedy testified he was driving approximately 75 or 76 miles per hour. (10:04:21 – 25). As Lt. Kennedy was in the fast lane approaching the point at which he would begin to pass the vehicle, Lt. Kennedy testified the vehicle suddenly, "without signaling", the vehicle "just swerved over in front of" Lt. Kennedy while he was in the passing lane. (10:04:26

---

[2] All time references contained herein refer to the audio recording of the Motion Hearing held in the Clarksburg Magistrate Judge Courtroom on Wednesday, January 15, 2020, found in FTR Gold.

– 40). Because the vehicle swerved in front of him so suddenly and without signaling, Lt. Kennedy testified he had to "apply the brakes to keep from hitting the vehicle." (10:04:41 – 46).

Lt. Kennedy testified there were no other vehicles in the area at that time and nothing that he noticed that would have caused the driver of the Kia to swerve in front of Lt. Kennedy so abruptly. (10:04:48 – 10:05:03). Lt. Kennedy testified the driver of the Kia committed two separate traffic violations. Lt Kennedy testified the driver of the Kia "failed to yield the right of way" as Lt. Kennedy was passing, and the driver failed to "signal" when changing into the passing lane. Lt. Kennedy further testified that the "left lane" or "passing lane" on the interstate is designated by law as a "passing lane" and drivers are not to be using the lane unless as a means for passing another vehicle. (10:05:15 – 10:05:53).

After applying his brakes to avoid hitting the vehicle, Lt. Kennedy then observed the vehicle for approximately one half of a mile. Lt. Kennedy noticed the driver of the Kia was "erratically speeding up and slowing back down" and "drifting side to side in his own lane." (10:05:58 – 10:06:17. At that time, Lt. Kennedy decided he needed to initiate a traffic stop on the vehicle. Lt. Kennedy testified he felt he "needed to check on the driver" and that he was thinking the driver may have "some sort of impairment," whether that be drowsiness, drugs or alcohol, or "some sort of medical condition." (10:06:18 – 10:06:43).

Upon initiating the traffic stop, Lt. Kennedy approached the driver side of the vehicle and spoke with the driver of the Kia. (10:06:44 – 10:07:21). Lt. Kennedy asked for the driver's license, registration, and insurance. At that time, the driver advised Lt. Kennedy he did not have a driver's license as it had been suspended. (10:07:21 – 32). Lt. Kennedy noticed the driver was "sweating profusely" and he did not want to make eye contact, his hands were shaking, and he was very nervous. (10:07:34 – 10:07:49). Lt. Kennedy testified that these physical characteristics

immediately struck him as someone who could be "dope sick." (10:08:01 – 10). The driver identified himself as "Darrell Reese." (10:08:12 – 16). There was also a "front seat passenger" present in the vehicle later identified as Keith Ross. (10:08:17 – 32).

After Defendant advised that his license was suspended, Lt. Kennedy obtained his name and date of birth in order to run a license check on him. Lt. Kennedy inquired as to why Defendant was "sweating so bad" and he advised that the "front seat passenger was sick in the vehicle and he had the heater on high." (10:09:00 – 19). Lt. Kennedy asked Mr. Reese where he was coming from and where he was going. At that time, Mr. Ross, the passenger, sat up in his seat and began addressing Lt. Kennedy. Mr. Ross advised they had just left Fairmont where they were visiting his sister. Mr. Ross further advised they were on their way to Raleigh County to visit his grandchild in the hospital. (10:09:21 – 42). Lt. Kennedy asked Mr. Ross where they were at in Fairmont and Mr. Ross could not provide an address or a general location in Fairmont. (10:09:44 – 10:10:05).

Lt. Kennedy returned to his cruiser to run Defendant, Mr. Reese's information through central dispatch in Fairmont. Dispatch returned information indicating Mr. Reese's license was suspended or revoked in the State of West Virginia. (10:10:18 – 39). At that time, Lt. Kennedy returned to the vehicle, advised Mr. Reese his license was revoked, and asked him to step out of the vehicle. (10:10:39 – 47). Lt. Kennedy then escorted Mr. Reese to the rear of the vehicle and checked him for weapons. Lt. Kennedy then placed Mr. Reese in handcuffs and had Mr. Reese sit in the rear passenger side seat of his police cruiser. (10:11:02 – 08). Lt. Kennedy testified that, at this time, it was his intention to arrest Mr. Reese for driving without a valid license in the State. Lt. Kennedy informed Mr. Reese of his intention to arrest him and asked if there were any weapons or drugs in the vehicle. Mr. Reese advised there was not. (10:11:10 – 36).

After sitting Mr. Reese in his police vehicle, Lt. Kennedy again approached the Kia, this time on the passenger side to address Mr. Ross. Lt. Kennedy intended to gather Mr. Ross' identification, check if he was a licensed driver, and determine whether Mr. Ross would be able to drive the vehicle or if it would need to be towed. (10:11:38 – 10:12:02). As Lt. Kennedy approached the passenger side of the vehicle, Mr. Ross attempted to exit the vehicle. Lt. Kennedy prevented him from doing so and ordered him to get back in the vehicle. Lt. Kennedy testified he stood in between Mr. Ross and the open passenger side door. (10:12:06 – 26).

As Mr. Ross returned to his seat, Lt. Kennedy requested Mr. Ross' identification. As Mr. Ross searched for his identification, Lt. Kennedy began shining his flashlight around the vehicle to ensure there were "no weapons within the area he was sitting in." (10:12:37 – 58). At that time, Lt. Kennedy observed a "baggie sitting on the floor with some sort of white looking substance and some capsules that were in the baggie that are commonly used to package narcotics." The door was still open at the time and the baggie was sitting by Mr. Ross' right foot on the floor. (10:12:59 – 10:13:22). Lt. Kennedy believed the baggie contained narcotics.

Lt. Kennedy did not indicate or "let Mr. Ross know" that he had noticed what he believed to be narcotics on the floor of the vehicle at that time. (10:13:28 – 39). Lt. Kennedy received Mr. Ross' I.D., asked him to step out of the vehicle, escorted him to the rear of the vehicle and advised Mr. Ross he was placing him in handcuffs for safety purposes. (10:13:42 – 53). After placing Mr. Ross in handcuffs, Lt. Kennedy advised him he had observed what he believed to be narcotics inside of the car on the floor by Mr. Ross' right foot. (10:13:54 – 10:14:06).

Mr. Ross denied knowledge of the baggie observed on the floor of the vehicle. Lt. Kennedy then placed Mr. Ross in his cruiser and called for backup to assist him while he searched the vehicle. (10:14:09 – 26). Within approximately ten to fifteen minutes, Corporal Swiger arrived on

scene from the Bridgeport detachment to provide backup (10:14:29 – 45). Corporal Swiger "watched Mr. Reese and Mr. Ross" while Lt. Kennedy went to search the vehicle. (10:14:41 – 49). While in the vehicle awaiting backup, Lt. Kennedy asked Mr. Ross what the substance was on the floor of the vehicle. Mr. Ross denied knowledge of the baggie and stated that he had loaned the car to a friend and the baggie may have been left there by his friend without his knowledge. (10:14:51 – 10:15:11). Lt. Kennedy explained to Mr. Ross that he was concerned that something in the baggie may be harmful and advised that if the substance harmed him or another officer, Mr. Ross and Mr. Reese would face additional charges. (10:15:12 – 28). Specifically, Lt. Kennedy testified he was concerned about the potential presence of fentanyl.

After Lt. Kennedy made this statement to Mr. Ross, Mr. Ross advised that the bag on the floor contained heroin. Mr. Ross advised that he and Mr. Reese had driven to Baltimore, where they purchased the heroin for "$4,400" and were bringing it back to West Virginia to sell. (10:15:36 – 57). As he exited the vehicle, Lt. Kennedy asked if there was anything else in the vehicle. Mr. Ross advised there was not. However, Mr. Reese advised that there was a needle in the center console that contained heroin. (10:16:02 – 21).

Lt. Kennedy then conducted a search of the vehicle. Lt. Kennedy seized the substance and baggie from the floor. Lt. Kennedy continued to search the vehicle where he located two more cell phones. However, Lt. Kennedy did not locate the needle. (10:16:25 – 54). Lt. Kennedy advised Mr. Reese and Mr. Ross that the needle was no longer inside the vehicle. Mr. Ross made the statement that he had thrown it out of the window while Lt. Kennedy was dealing with Mr. Reese. Lt. Kennedy later located the needle outside of the vehicle on the other side of the guard rail. (10:16:56 – 10:17:17). After the recovery of the suspected narcotics, the needle, and the cell phones, both men were arrested and transported for processing. Mr. Ross further advised Lt.

8

Kennedy that he had "a lot of drug information" and that he wished to speak with someone in an effort to "help himself out of the current situation." (10:17:20 – 48).

Counsel for Defendant Darrell Ernest Reese, Hilary Godwin, Assistant Federal Public Defender, cross-examined Lt. Kennedy. (10:17:54). Lt. Kennedy testified he was approximately only ten feet from the vehicle when it swerved in front of him in the passing lane. (10:18:20 – 30). Lt. Kennedy testified that the Defendant's movement into the passing lane in front of him was an "abrupt movement" and testified he believed the Defendant was travelling approximately 65 miles per hour or below. (10:18:45 – 57). Lt. Kennedy again reiterated that he observed the vehicle for approximately one half of a mile. Lt. Kennedy testified that he observed the vehicle accelerating and decelerating, weaving in its own lane, and driving erratic. (10:19:25 – 47).

Lt. Kennedy acknowledged that these instances were not included in his initial report. Lt. Kennedy testified that these observations were left out because he believed, that when the arrest warrant was written, there was enough for probable cause to believe the Defendant had swerved and cut him off and slowed down to a speed of 58 mph on the interstate. (10:19:48 – 10:20:04). Lt. Kennedy testified he believed this would "be enough under a typical DUI investigation if he was following a vehicle." (10:20:06 – 18). Lt. Kennedy testified one half of a mile of observation was sufficient because he would not want to "let the vehicle continue to travel to where it can cause harm to himself or someone else." (10:20:21 – 36). Lt. Kennedy testified that Mr. Reese did not advise there was anything in his lane that would have caused him to swerve in front of Lt. Kennedy abruptly. (10:20:38 – 10:21:16).

The parties submitted Lt. Kennedy's report to the Court as a Joint Exhibit and the Exhibit was filed herein at ECF No. 64-1.

### III.   <u>CONTENTIONS OF THE PARTIES</u>

**A. Defendant's Motion to Suppress**

Defendant's Motion to Suppress Physical Evidence (ECF No 51) argues that the "traffic stop was unlawful because First Lieutenant Kennedy lacked reasonable suspicion of an offense to support the traffic stop." (ECF No. 51 at 2). Defendant states that the "available information indicates that Mr. Reese changed lanes and decreased speed." <u>Id.</u> Defendant further argues there is no "indication that he did so in an unsafe or unlawful manner." <u>Id.</u> at 2-3. Defendant also contends that there is no "minimum speed" limit on highways and interstates in West Virginia, and therefore, Mr. Reese was not "driving too slow." <u>Id.</u> at 3. Defendant argues that neither "changing lanes" nor "decreasing speed" are violations of West Virginia law. Therefore, there are no grounds for a lawful traffic stop. <u>Id.</u>

**B. Government's Response**

The Government, in its Response (ECF No. 53) argues that the Defendant was "operating a vehicle which was lawfully stopped for traffic violation." (ECF No. 53 at 3). The Government contends that the "officer immediately learned defendant did not have a valid driver's license and quickly developed probable cause to search the vehicle." <u>Id.</u> Therefore, the Government argues Defendant's Motion to Suppress Physical Evidence should be denied.

### IV.   <u>LEGAL ANALYSIS</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." <u>U.S. Const. amend. IV.</u> "Stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments . . ." <u>Delaware v. Prouse</u>, 440 U.S. 648, 654 (1979). A law enforcement officer is permitted to stop a vehicle when he or she sees that vehicle violate a

traffic law. *See* United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012); *See also* United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (A traffic stop is reasonable in its inception "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. Without question, such a violation may include failure to comply with traffic laws.") (internal citation and quotation omitted).

Further, a vehicle stop is permitted upon reasonable and articulable suspicion of unlawful conduct. United States v. Arvizu, 534 U.S. 266, 273-75 (2002). "Whether reasonable suspicion exists depends upon the totality of the circumstances, including the information known to the officer and reasonable inferences to be drawn at the time of the stop." United States v. Jennings, No. 6:06-CR-00004, 2008 U.S. Dist. LEXIS 81693, at *5 (W.D.Va. Oct. 15, 2008) (citing Arvizu, 534 U.S. at 273). "While reasonable suspicion consists of more than a 'mere hunch,' it need not rise to the level of probable cause and falls considerably short of the preponderance of the evidence standard. Id. at 5-6 (citing Arvizu, 534 U.S. at 274).

**A.  Lieutenant Kennedy had the requisite reasonable, articulable suspicion of unlawful conduct to initiate a traffic stop on Defendant's vehicle based upon traffic violations and erratic driving consistent with that of an impaired driver.**

The undersigned finds the testimony of Lt. Kennedy at the motion hearing held on January 15, 2020 to be credible. Lt. Kennedy testified that he observed a silver Kia traveling on I-79 at approximately 6:30 A.M. on March 21, 2019. Lt. Kennedy testified that he moved into the "fast lane" to pass the vehicle. As he approached the rear of the vehicle in attempting to pass, Lt. Kennedy testified the vehicle "abruptly" swerved in front of him without signaling. Lt. Kennedy testified he had to "apply the brakes to keep from hitting the vehicle." Lt. Kennedy testified there were no other vehicles in the area at the time and did not observe anything in the road that would have prompted the Defendant to swerve in front of him. Lt. Kennedy observed the vehicle for

approximately one half of a mile. During that time, Lt. Kennedy observed the vehicle "erratically" accelerating and decelerating and "drifting side to side in his own lane." These observations prompted Lt. Kennedy to believe the driver may be under some sort of impairment and he initiated the traffic stop.

Based upon the foregoing, the undersigned **RECOMMENDS** the District Judge find that Lt. Kennedy possessed reasonable, articulable suspicion of unlawful conduct necessary to initiate a lawful traffic stop of the Defendant's vehicle. Based upon Lt. Kennedy's testimony, the Defendant committed two traffic violations in his failure to signal before changing lanes in violation of W. Va. Code §17C-8-8(a) and failure to yield the right of way to Lt. Kennedy's passing vehicle in violation of W. Va. Code §17C-7-3(a)(3). Lt. Kennedy also testified that it is unlawful to drive in the "passing lane" on the interstate unless the lane is being used to pass another vehicle. As a result, the Defendant was also in violation of W. Va. Code §17C-7-1(b) because the Defendant swerved into the passing lane without any intent to pass another vehicle. Further, Lt. Kennedy's observations of the vehicle were indicative of an impaired driver and adequate to initiate a traffic stop based upon reasonable, articulable suspicion of driving under the influence of alcohol, controlled substances or drugs in violation of W. Va. Code §17C-5-2.

**B. Lieutenant Kennedy had probable cause to search the vehicle upon seeing the baggie and capsules in plain view on the floorboard of the vehicle.**

The Fourth Amendment requires that "searches be conducted pursuant to a warrant issued by an independent judicial officer." California v. Carney, 471 U.S. 386, 390 (1985). An established exception to the warrant requirement is the "automobile exception." United States v. Kelly 592 F.3d 586, 589 (4th Cir. 2010). Under this exception, police may search a vehicle without a warrant if "probable cause exists to believe it contains contraband" and the vehicle is "readily mobile." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996).

After initiating the traffic stop on Defendant's vehicle, Lt. Kennedy approached the driver side and began speaking with the driver of the vehicle who was identified as the Defendant, Darrell Ernest Reese. Lt. Kennedy requested Mr. Reese's driver's license, registration, and insurance. Mr. Reese advised that he did not have a driver's license as it had been suspended. Lt. Kennedy observed that the driver, Mr. Reese, was "sweating profusely" and did not want to make eye contact. Lt. Kennedy further observed that Mr. Reese's hands were shaking, and he was very nervous. Lt. Kennedy described the Defendant's behavior and appearance as someone who could be "dope sick."

Lt. Kennedy asked Mr. Reese where he was coming from and where he was going. At that time, the passenger, identified as Keith Ross, sat up and explained they had just left Fairmont where they were visiting his sister. When asked where at in Fairmont, Mr. Ross could not provide an address or a general location. Lt. Kennedy ran Mr. Reese's information through central dispatch in Fairmont. Dispatch returned information indicating Mr. Reese's license was indeed suspended or revoked in the State of West Virginia. At that time, Lt. Kennedy had probable cause to arrest the Defendant for driving on a suspended license. Lt. Kennedy than asked the Defendant to exit the vehicle, checked him for weapons, placed him in handcuffs, and placed the Defendant inside of his cruiser.

Lt. Kennedy then began to return to the vehicle to speak with the passenger, Mr. Ross. Lt. Kennedy testified it was his intention to inquire whether Mr. Ross had a valid driver's license and would be capable of driving the vehicle or if the vehicle would need to be towed. At that time, Mr. Ross attempted to exit the vehicle. Lt. Kennedy ordered him to remain in the vehicle. Mr. Ross returned to his seat in the vehicle. While Lt. Kennedy was standing between Mr. Ross and the open door of the vehicle, Lt. Kennedy requested Mr. Ross' driver's license. While Mr. Ross was

searching for his license, Lt. Kennedy began shining his flashlight around the vehicle to ensure there were "no weapons within the area he was sitting in." At that time, Lt. Kennedy observed a "baggie sitting on the floor" with a "white looking substance and some capsules that were in the baggie that are commonly used to package narcotics." The baggie and suspected illegal substances were located within plain view by Mr. Ross' right foot on the floor. At that time, Lt. Kennedy ordered Mr. Ross out of the vehicle, placed him in handcuffs, checked him for weapons and placed him in his cruiser.

Upon observing the baggie, white substance, and capsules on the floor of the vehicle, in combination with the Defendant's nervous behavior, sweating, appearance of being "dope sick", and Mr. Ross' inability to identify where the two were coming from in Fairmont, the undersigned **RECOMMENDS** the District Judge find that Lt. Kennedy had probable cause to believe the vehicle contained contraband and his subsequent search of the vehicle was lawful.

## V.   **RECOMMENDATION**

Accordingly, for the reasons stated herein, the undersigned **RECOMMENDS** Defendant's Motion to Suppress (ECF No. 51) be **DENIED**.

Any party shall, within three (3) days[3] after being served with a copy of this Report and Recommendation, **on or before Friday, January 24, 2020**, file with the Clerk of the Court **specific written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.** A copy of such objections should

---

[3] "Although parties are typically given fourteen days to respond to a Report and Recommendation, see 28 U.S.C. § 636(b)(1), this allowance is a maximum, not a minimum, time to respond, and the Court may require a response within a shorter period if exigencies of the calendar require. United States v. Barney, 568 F.2d 134, 136 (9th Cir.1978)." United States v. McDaniel, 1:16-CR-52 (ECF No. 32 at 14-15, at footnote). See also United States v. Cunningham, 2011 WL 4808176, at Footnote 1 (N.D. W. Va., Oct. 6, 2011) and United States v. Mason, 2011 WL 128566, at Footnote 7 (N.D. W.Va., Jan. 7, 2011). In this case, the final pretrial conference is set before the Honorable District Judge Thomas S. Kleeh on February 4, 2020, and Jury Selection and Trial is set for February 18, 2020. The resulting calendar exigency thus warrants shortening the period with which to file objections to the Report and Recommendation from fourteen (14) days to three (3) days.

also be submitted to the Honorable Thomas S. Kleeh, United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to timely file written objections to the Report and Recommendation as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to the Defendant at his last known address on the docket, any parties who appear *pro se* and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted on Tuesday, January 21, 2020

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE